IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KATHLEEN A. HARASEK )<br>47261 Middle Bluff Place )<br>Potomac Falls, VA 20165 )<br> )<br>        Plaintiff, )<br> )<br>              v. )<br> )<br>NATIONAL RAILROAD PASSENGER )<br>    CORPORATION d/b/a AMTRAK )<br>60 Massachusetts Avenue, NE )<br>Washington, DC 20002 )<br> )<br>Serve:  CT CORPORATION SYSTE )<br>        Registered Agent )<br>        1015 15th Street NW, Suite 1000 )<br>        Washington, DC 20005 )<br> )<br>        Defendant. )<br> ) | COMPLAINT<br>C.A. No. _____ |

## COMPLAINT

COMES NOW THE PLAINTIFF, KATHLEEN A. HARASEK, by counsel, and moves this Court for entry of judgment in her favor, and against the NATIONAL RAILROAD PASSENGER CORPORATION d/b/a AMTRAK, the Defendant, and in support of such Complaint alleges and avers as follows:

## NATURE OF ACTION

1.      This civil action states a claim by Kathleen A. Harasek ("Ms. Harasek" or "Plaintiff") against the National Railroad Passenger Corporation d/b/a Amtrak ("Amtrak" or "Defendant") for retaliation in violation of the False Claims Act 31 U.S.C. § 3730 (h) ("False Claims Act").

## PARTIES

2.      Plaintiff, Ms. Harasek, is a resident and citizen of Loudoun County in the Commonwealth of Virginia.

3.      At all times material hereto, Ms. Harasek was an "employee" of Defendant Amtrak as defined under the False claims Act and was entitled to protection under the provisions of said Act.

4.      Defendant Amtrak is present and conducts business in the District of Columbia and all acts complained of herein occurred in the District of Columbia.

5.      At all times relevant hereto, Defendant Amtrak was acting through its agents, servants and employees, who were acting within the scope of their authority, course of employment, and under the direct control of Defendant.

6.      At all times material herein, Defendant Amtrak is and has been an "employer" as defined under the False claims Act, as is accordingly subject to the provisions of said Act.

## JURISDICTION

7.      This Court has jurisdiction over Plaintiff's claims pursuant to 31 U.S.C. §3730, *et seq.* and 28 U.S.C. §1331.

8.      The amount in controversy exceeds the jurisdictional minimum amount for this Court.

9.      Amtrak is present in and regularly conducts business in this judicial district with its headquarters being within the District of Columbia.

10.     The cause of action alleged in this action arose or originated within the District of Columbia.

## VENUE

11.     Amtrak is present in and regularly conducts affairs and business activities in this judicial district.

12.     The cause of action alleged in this action arose or originated in this judicial district.

13.     The unlawful employment practices committed by Amtrak occurred or originated in this judicial district, employment records relevant to such practices are maintained and administered in this judicial district, and Amtrak operates and maintains its headquarters in this judicial district.

14.     Venue over Plaintiff's claims is proper in this Court pursuant to 28 U.S.C. §1391.

## STATEMENT OF FACTS

15.     Ms. Harasek was hired by Defendant Amtrak for the position of Inspector – Mid-Atlantic South Patrol Operations in July, 2013.

16.     Prior to her employment with Amtrak, Ms. Harasek had an impressive 25 year professional career with the United States Park Police ("U.S. Park Police"), rising to the position of Captain before retiring in July, 2013.  While employed with the U.S. Park Police, Ms. Harasek had gained a stellar reputation for planning and orchestrating the security detail for large scale events held in the Washington Metropolitan Area, including: parades, marches, protests, and the inauguration of President Obama in 2009 and again in 2013.

17.     At the time of Ms. Harasek's hiring by Amtrak she was assigned to report to Deputy Chief Thornton, and worked under the direction and supervision of Chief Polly Hanson ("Chief Hanson").  In October 2013, Deputy Chief Thornton resigned and was replaced by Deputy Chief Rappaport in May 2014.

18.     In the fall 2014, Ms. Harasek met with her direct report supervisor, Deputy Chief Rappaport, to review her mid-year progress on her annual performance goals.  Amtrak's Smart Goals (i.e., annual performance goals) are employee specific and set by the employee or established through a collaborative process between the employee and their direct supervisor. During this meeting, Ms. Harasek and Deputy Chief Rappaport reviewed the 9 Smart Goals based on her then-assigned job duties and responsibilities.  The performance period for accomplishing these goals extended from October 1, 2014 through September 30, 2015.

19.     In the spring of 2015, Ms. Harasek was selected by Chief Hanson as one of two leads for the APD in the planning and preparation for the historical visit of Pope Francis to the United States in September, 2015 ("Papal Visit").  This assignment was a massive undertaking and would involve coordination and planning between the Amtrak Police Department ("APD"), Amtrak Corporate entities, numerous United States security agencies, including the United States Secret Service ("Secret Service"), and scores of local law enforcement agencies at the federal, state and local level along the northeastern United States.

20.     Ms. Harasek was selected by Chief Hanson to serve in this role based on her significant experience with the U.S. Park Police, planning security detail for large scale multi-agency special events.

21.     In April 2015, as a result of being selected to serve in the leadership role of this complicated and high profile operation[1], Ms. Harasek's job duties and responsibilities were re-assigned at the direction of Chief Hanson and APD leadership, including Deputy Chief Trugman, to allow her to dedicate her full time and attention for the remainder of the fiscal year on the special Papal Visit assignment.  To allow Ms. Harasek to focus on the Papal Visit, her

administrative and operational responsibilities were transferred and assigned to Captain Jacobsen for the remainder of the fiscal year.

22.     Amtrak's fiscal year runs from October 1st through September 30th. The fiscal year also represents the same period of time Amtrak employees are evaluated for their annual performance reviews.

23.     In June 2015, Deputy Chief Rappaport announced that he would be retiring from the APD later that month.

24.     Also in June 2015, Ms. Harasek met with Deputy Chief Rappaport for her annual mid-year review. During that meeting, Chief Rappaport acknowledged Ms. Harasek's strong performance during the first half of the year, mentioned that Deputy Chief Trugman would be assuming his prior role, and that the focus of her duties and responsibilities should be on the upcoming Papal Visit since her other responsibilities had been re-assigned.

25.     Deputy Chief Rappaport specifically commented in Ms. Harasek's Mid-Year Performance Review that "Inspector Harasek's work in the first half of the year has been strong. She is involved in a number of special projects that are delivering results. She has worked to develop Captain Jacobsen during his first year with Amtrak." There were no negative ratings or comments in her 2015 Mid-Year Performance Conversation Review.

26.     Subsequent to the resignation of Deputy Chief Rappaport, Ms. Harasek's 2015 Performance Review was assigned to Chief Hanson in June, 2015.

27.     While employed with Amtrak, as part of Ms. Harasek's duties and responsibilities, she organized and led instructional programs provided to Amtrak employees, as well as external law enforcement partners and third party-vendor groups that worked on or near Amtrak site locations. During her time in this role, Ms. Harasek developed and prepared Power

Point presentations provided to assist Amtrak and its partners with the preparation for large scale, multi-agency security operations.

28.     To assist with educating Amtrak's external law enforcement agency partners with understanding the capabilities of the APD, as well as how best to assist with responding to incidents within the APD's jurisdiction, Amtrak established a two-day outreach program entitled RailSafe. The RailSafe program was presented by members of the APD to local law enforcement agencies throughout the country that had partnered with Amtrak to assist with security issues on Amtrak assets and property within their geographic locations.

29.     As part of this program, Amtrak also worked directly with third-party vendors that worked on security projects and planning exercises to ensure that the contracted deliverables met the needs and expectations of the APD, in order to best serve Amtrak and its customer base.

30.     Starting in 2014, the Amtrak RailSafe program was funded through grant money received by Amtrak from the United States Transportation Security Administration ("TSA"). The TSA is an agency within the United States Government, Department of Homeland Security.

31.     As part of the contracting process, numerous companies submitted bids in an effort to obtain the RailSafe program award. Ultimately, the third-party security consulting firm ABS Consulting ("ABS") was awarded the contract.

32.     The contract awarded to ABS by Amtrak through federal funds (TSA Grant money) was in excess of $1,000,000.

33.     During the summer of 2015, Ms. Harasek became aware that ABS was involved in fraudulent, or potentially fraudulent, activity arising from its work associated with the RailSafe program. Moreover, Ms. Harasek had knowledge that Chief Hanson was involved in a long-standing and close personal relationship, including cohabitation and joint ownership of

assets, with Kerry Thomas ("Mr. Thomas") of ABS. Moreover, due to Chief Hanson's close personal relationship with Mr. Thomas, Ms. Harasek had reason to believed that Chief Hanson was directly or indirectly involved, and/or economically benefitting from, the fraudulent activity and submission of, or participation in, false claims.

34.    Mr. Thomas was involved in ABS's bid submission for the Amtrak contract funded through TSA grant money, served as the RailSafe project manager, and is a principal in the company. Chief Hanson had knowledge of this information and oversaw the awarding of the bid for Amtrak's RailSafe program as well as the claims submitted by ABS for payment and/or reimbursement from the United States Federal Government through TSA grant money.

35.    Ms. Harasek also became aware that the handouts and materials ABS was providing to attendees at RailSafe program sessions had actually been prepared by Amtrak personnel, including material Ms. Harasek had prepared in her role with Amtrak for past programs she instructed. ABS was passing off this material as its own without permission or consent.

36.    In addition, under Chief Hanson's knowledge and direction the presentations that were being provided were led and conducted by Amtrak personnel, not ABS. In fact, it was rare that anyone affiliated with ABS was providing anything more than nominal ministerial services.

37.    Moreover, Amtrak personnel and resources were being utilized to find and secure all locations for providing the RailSafe presentations, not ABS. In essence, despite ABS's contract to provide services funded through a TSA grant for over $1,000,000, Amtrak was operating and conducting the vast majority, if not all, aspects of the RailSafe program.

38.     Meanwhile, ABS was fraudulently submitting claims for government reimbursement for the work that was actually being performed by Amtrak personnel, all under the direction and supervision of Chief Hanson.

39.     Based on this knowledge, Ms. Harasek reported this information to Amtrak's Office of the Inspector General ("OIG") in mid-October 2015, requesting that the OIG investigate what she perceived to be Chief Hanson's potential involvement with fraudulent claims for payment and/or reimbursement on a contract with the United States Government, vis-à-vis, the TSA.

40.     On or about September 30, 2015, Ms. Harasek updated and completed the self-evaluation sections of her 2015 Amtrak Performance Conversation ("Performance Review"). The nine Smart Goals that were assigned to Ms. Harasek in September 2015 were never updated to reflect her new responsibilities, despite being specially assigned in April to a lead position in the security planning for the Papal Visit for the majority of the second half of the review year. As a result, Ms. Harasek identified her accomplishments towards the Smart Goals as being met or exceeded during the time period they were within her operation perimeters.  Ms. Harasek also commented in the self-comments section of her Performance Review that "during the last quarter of the rating period I was detailed on special assignment to assist in the planning and implementation of operational plans for the 2015 Papal Visit to New York, Philadelphia, and Washington, DC.  I worked collaboratively with APD commanders and business line partners to establish a sound operational plan to include the radio interoperability from NY to DC."

41.     On or about October 21, 2015, and subsequent to Ms. Harasek's reporting of the perceived fraud to Amtrak's OIG, Ms. Harasek was requested to attend a meeting with Chief Hanson.  During this meeting, Chief Hanson advised Ms. Harasek that she was being transferred

from her position as Inspector – Mid Atlantic South Patrol Division, to the previously unfilled position of Inspector/Inspection and Audits.

42.     Chief Hanson offered no valid explanation for Ms. Harasek's transfer other than her assertion that there never was supposed to be an Inspector for the Mid-Atlantic Division South.  Meanwhile, the position to which Ms. Harasek was transferred (Inspector/Inspection and Audits) was vacant and had not been filled by Amtrak during the past 20 years.

43.     Chief Hanson's decision to transfer Ms. Harasek to the previously vacant auditor position came within weeks of Ms. Harasek's successful leadership of the Papal Visit involving the coordination of dozens of law enforcement and security agencies throughout the Northeast Corridor (covering Washington, Philadelphia, and New York) and after her notifying Amtrak OIG of the potential fraud.

44.     During the months leading to the Papal Visit, Ms. Harasek worked tirelessly throughout the spring and summer with the Secret Service and other high profile law enforcement agencies on security and logistics planning.  Ms. Harasek's efforts led to the operational success of the events and to her receiving commendations from the CEO of Amtrak, the Director of the Secret Service, and the Special Agent in Charge of the New York Field Office for the Secret Service.

45.     At the same time Ms. Harasek was receiving special recognition and awards for her exemplary service for her leadership and skills in operational planning, Chief Hanson transferred her to the previously defunct position of Inspector of Audits.  The duties and responsibilities of this new auditor position ran far afield of Ms. Harasek's prior operational responsibilities for the APD primarily involving compliance review of Amtrak programs, policies, and personnel.  Moreover, Ms. Harasek was stripped of supervisory duties and

administrative staff and now reported to the Deputy Chief of Strategic Planning located in Philadelphia, PA., with limited exposure to other ranking APD personnel. Ms. Harasek was assigned menial tasks and undesirable assignments including, but not limited to checking the driver's license status of APD employees and reviewing the utilization of APD fleet gas cards. The transfer to this new undesirable position of lesser status was in retaliation for her reporting false claims activities to the OIG and precluded Ms. Harasek from further career advancement at Amtrak resulting in materially adverse consequences that inflicted tangible harm.

46.     Subsequent to this meeting, Ms. Harasek checked the status of her Performance Review through Amtrak's on-line computer platform which showed that as of October 21, 2015, Chief Hanson had not completed Ms. Harasek's 2015 Performance Review.

47.     On November 17, 2015 a telephone conference was hosted by Chief Hanson and attended by Ms. Harasek, as well as her new direct supervisor, Deputy Chief Shahade. During the first few minutes of the conference call Chief Hanson, Deputy Chief Shahade and Ms. Harasek discussed projects for the upcoming Thanksgiving holiday.

48.     Also during this conference call Chief Hanson assigned Ms. Harasek holiday travel duty and tasked her with personally appearing at the Wilmington, Delaware Amtrak Station to oversee travel operations for the U.S. Vice President, normally supervised by a Sergeant. Because the Vice President frequently traveled from Washington, DC to Wilmington, DE by train, and had been doing so for the past 7 years, his transportation security detail was routine and not considered a special event warranting the assignment of an Inspector from Washington, DC to supervise. In fact, the typical protocol was to assign a Sergeant or Captain from the Philadelphia Station to oversee the Vice President's frequent travel, not requiring an Inspector to travel six hours roundtrip from her home in Northern Virginia to oversee the

operations. This assignment over the Thanksgiving holiday was in retaliation of Ms. Harasek's reporting the false claims allegations to the Amtrak OIG and her false claim activities.

49.     After dismissing Deputy Chief Shahade from the same November 17, 2017 telephone conference call, Chief Hanson remained on the phone with Ms Harasek. Once alone with Ms. Harasek on the phone, Chief Hanson advised she had knowledge of Ms. Harasek's reporting of fraudulent, or potentially fraudulent, activity to the Amtrak OIG by stating, in a threatening tone, "I know who you have been talking to." Chief Hanson also accused Ms. Harasek of causing problems within Amtrak, and further threatened that Ms. Harasek should resign from the APD or there would be negative consequences for her.

50.     Chief Hanson's threats were a direct result of, and in retaliation for, Ms. Harasek's reporting false claims allegations to the Amtrak OIG and her false claim activities.

51.     Throughout late October through early December 2015, Ms. Harasek regularly reviewed the Amtrak on-line computer platform to check the status of her Performance Review by Chief Hanson.

52.     On or about December 4, 2015, Ms. Harasek inspected Amtrak's one-line computer platform and learned that the 2015 Amtrak Performance Review had been completed by Chief Hanson.

53.     On 4 of the 9 Smart Goals set forth on Ms. Harasek's Performance Evaluation Chief Hanson rated her as "Did Not Meet Commitments" with an "Overall Performance Rating [of] Did Not Meet Commitments."

54.     Amtrak Smart Goal Ratings dictate and drive the promotional opportunity for Amtrak personnel as well as salary increases and monetary awards. Chief Hanson's negative ratings of Ms. Harasek's 2015 Performance Review precluded Ms. Harasek from receiving any

promotion, salary increase or monetary award at the end of the fiscal year, as well as derailed her from further advancement and future career opportunities with Amtrak  Ms. Harasek received salary increases and monetary awards during past years.

55.    At no time during the final months of the 2015 rating period did Chief Hanson provide Ms. Harasek any notice, comments, or provide feedback that she was not performing sufficiently or meeting her goals prior to completing her Performance Review.  Meanwhile, it is protocol for a supervisor to provide notice, comments, or feedback when goals are not being met in order to provide an opportunity for improvement.

56.    On or about January 7, 2016, Ms. Harasek met with Chief Hanson to discuss her 2015 Performance Review.  A representative from Human Capital, Ann Sherrill ("Ms. Sherrill"), was present at the request of Chief Hanson.

57.    Since Ms. Harasek's Performance Review was completed and posted as of December 4, 2015, Ms. Harasek had brought documentation in anticipation of her January 7, 2016 meeting with Chief Hanson to clarify and rebut the ratings and comments set forth therein. Most significantly, when Ms. Harasek identified the documentation transferring her for the special Papal Visit and re-assignment of her operational duties by Amtrak leadership during the Performance Review conversation, Chief Hanson refused to recognize the prior orders, including her own, and was dismissive of any of the materials that Ms. Harasek attempted to proffer.

58.    Following the meeting with Chief Hanson on January 7, 2016, Ms. Harasek contacted Julia Costello ("Ms. Costello"), Senior Employee Relations Manager, and inquired as to the next procedural steps for appealing her Performance Evaluation.  Ms. Costello advised Ms. Harasek that her grievance would need to be conducted at the agency level and that Chief

Hanson would be the individual who would be responsible for responding to further inquiries related to the Performance Evaluation.

59.     In response, Ms. Harasek contacted Ms. Costello's supervisor, Dawn Marcelle ("Ms. Marcelle"), requesting clarity as to whether a more objective individual other then Chief Hanson could be assigned to address her grievance issue that was based on Chief Hanson's own review.

60.     On or about February 24, 2016, Ms. Harasek was notified by Amtrak's Human Capital Department that mediation could be set up with Chief Hanson, but pursuant to Chief Hanson's orders, she would not address the 2015 Performance Review and would only discuss matters regarding her new position as Auditor.

61.     On or about March 9, 2016, Ms. Harasek was notified by Inspector Guy Middleton, Commander of Internal Affairs Unit, APD ("Inspector Middleton") that a Complaint had been filed against her by Chief Hanson. Ms. Harasek was further notified that Chief Hanson had alleged that she provided "false and/or misleading statements to her sometime in 2015." Inspector Middleton further explained that he would need to interview Ms. Harasek as part of his investigation into the allegations of the Internal Affairs Complaint filed by Chief Hanson. The Internal Affairs Complaint was brought in retaliation of Ms. Harasek's reporting the false claims allegations to the Amtrak OIG and her false claim activities.

62.     On or about March 17, 2016, Ms. Harasek was interviewed by Inspector Middleton and learned that the allegations of the Complaint related to statements made by Ms. Harasek in the self-evaluation section of her 2015 Performance Review related to the inter-operability of radio communications between the APD and Baltimore, Maryland law enforcement agencies.

63.     At the conclusion of the March 17, 2016 investigation interview, Inspector Middleton advised Ms. Harasek that he was not the decision maker on the allegations of the Complaint and further advised that Chief Hanson would be acting as the trier of fact over the Complaint she had filed against Ms. Harasek.  Thus, the fate of the Internal Affairs investigation, and Ms. Harasek's future employment with Amtrak, lay in the hands of her accuser, Chief Hanson.  An adverse finding on the Internal Affairs Complaint could lead to disciplinary actions for Ms. Harasek, including, but not limited to, the loss of security clearance, loss of advancement opportunities, demotion, and termination.  Moreover, the mere filing of the Internal Affairs Complaint by Chief Hanson would have negative consequences for Ms. Harasek and impede her future employment opportunities and advancement at Amtrak.

64.     Subsequent to the recorded interview with Inspector Middleton, Ms. Harasek, through counsel she was compelled to retain, contacted Amtrak on numerous occasions to inquire on the status of the investigation, but never received any response.

65.     While the Internal Affairs investigation was pending, Ms. Harasek's future with Amtrak lay in the hands of her accuser, Chief Polly Hanson, who refused to make a decision on the matter holding its outcome over Ms. Harasek as further retaliation in an effort to silence her from participating in further investigative inquiries related to her OIG Complaint.

66.     After receiving an unfounded and fabricated 2015 Performance Review, denying Ms. Harasek of any promotion, salary increase, or monetary award; transfer to an undesirable and previously vacant position far afield from her prior operational position with assignment of meaningless undesirable tasks and responsibilities; being stripped of her supervisor duties and administrative staff; re-assigning her direct reporting chain of command to a less prominent supervisor; forcing her to travel out of state to attend meetings that were being conducted by

telephone conference and taking place in an adjacent building to her office; being cut off from the APD leadership and advancement potential; being intimidated to keep silent with respect to further communications with Amtrak's OIG and threats to start seeking new employment; and the initiation of an Internal Affairs investigation based on false allegations that was to be decided upon by her accuser, Chief Hanson, Ms. Harasek's working environment had become intolerable.  Moreover, because these adverse, harassing, retaliatory, and deliberate actions taken against Ms. Harasek by Chief Hanson were career ending, Ms. Harasek was constructively discharged by Amtrak on July 1, 2016.

67.     All of these adverse, harassing, and retaliatory actions were committed deliberately against Ms. Harasek following her reporting of fraud, or perceived fraud, in violation of § U.S.C. 3730(h).

68.     On or about March 29, 2017, subsequent to Ms. Harasek's constructive discharge and the resignation of Chief Polly Hanson, Amtrak's Captain Scott Oncay with APD Internal Affairs dismissed the Complaint that had been filed against Ms. Harasek by Chief Hanson. Specifically, the notice of the findings reads:

> In reference to a Complaint filed by former Amtrak Chief of Police Polly Hanson regarding the written comments [Ms. Harasek] made during [her] Fiscal Year 2015 Performance Conversation on September 30, 2015, an internal investigation was conducted.
>
> On March 29, 2017, the investigation was concluded.  It was found that [Ms. Harasek's] actions conformed to policy and no further action is required.  The case has been closed with a Non-Sustained status.

69.     As a consequence of Amtrak's harassing, threatening, and retaliatory actions against Ms. Harasek for blowing the whistle on her fraudulent activities in violation of U.S.C.§ 3730(h) Ms. Harasek was constructively discharged, thereby depriving her of the benefits of her livelihood and damaging the reputation of Ms. Harasek in her chosen industry and career.

## COUNT ONE
## RETALIATION IN VIOLATION OF THE FALSE CLAIMS ACT
### (Against Amtrak)

70.     The allegations of the foregoing paragraphs are incorporated as if realleged

herein.

71.     Amtrak has a duty under the False Claims Act, 31 U.S.C. §3730(h), to refrain

from taking retaliatory actions against employees who take lawful actions in furtherance of a

False Claim Act action, including reporting violations, or suspected violations, investigation for,

testimony for, or assistance in an action filed under this section.

72.     Ms. Harasek in good faith believed (and still believes) that Amtrak and its partner

ABS were engaged in repeated conduct that violated the False Claims Act by submitting bills for

services to the Federal Government that were not of the kind or quality they represented them to

be.

73.     Ms. Harasek's concerns were based on her years of service in the public sector as

manager of contracting in her previous position with the U.S. Park Police and belief that public

moneys were being abused in violation of federal law.

74.     Ms. Harasek took lawful action in furtherance of a False Claims action by

investigating her concerns and reporting her good faith concerns to Amtrak's OIG.

75.     Ms. Harasek had an objective and subjective reasonable belief that Amtrak was

violating its agreements with the Federal Government in violation of the False Claims Act.

76.     Subsequent to reporting her concerns of False Claims Act violations to the OIG,

the Amtrak Chief of Police, Chief Hanson, commenced on a path of retaliatory and harassing

actions including, but not limited to her transfer of Ms. Harasek to an undesirable position that

had previously not been filled in the past 20 years; assigning her little to no work or undesirable

meaningless projects; stripping of her supervisor duties and administrative staff; re-assigning her direct reporting chain of command to a less prominent supervisor; forcing her to travel out of state to attend official meetings that were conducted via teleconference and taking place at an adjacent building to Ms. Harasek's office in Washington, DC; minimizing her contact with other APD leadership; submitting an unfounded and falsified 2015 Performance Review by rating Ms. Harasek as "Did Not Meet Commitments" for 4 of the 9 categories for which she was evaluated and providing an overall rating of "Did Not Meet Commitments" thereby denying promotional opportunities, a salary increase, or monetary awards; verbally threatening Ms. Harasek to intimidate her from further assisting the OIG with any investigations into her activities; threatening Ms. Harasek to start looking for new employment outside of Amtrak; and filing an Internal Affairs Complaint against her alleging that Ms. Harasek provided Chief Hanson false and misleading information thereby depriving her of the benefits of her livelihood and damaging the reputation of Ms. Harasek in his chosen industry and career.

77.     Because these adverse, harassing, retaliatory, and deliberate actions taken against Ms. Harasek by Chief Hanson were career ending, Ms. Harasek was constructively discharged by Amtrak on July 1, 2016.

78.     Amtrak would not have taken these retaliatory actions against Ms. Harasek if she had not engaged in the protected activities.

79.     Ms. Harasek acted beyond the scope of her ordinary duties by investigating, analyzing and reporting the illegal actions of Chief Hanson.

80.     Pursuant to 31 U.S.C. §3730(h), Ms. Harasek is entitled to reinstatement plus double back pay, with interest, as well as compensation for attorney's fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff KATHLEEN A. HARASEK requests that this Court enter

judgment in her favor against Defendant Amtrak and further:

(a) Award Plaintiff compensatory damages, plus demonstrated past and future pecuniary

damages on each of the above-stated Counts, and in addition;

(b) Award Plaintiff such relief as provided for by the False Claims Act, 31 U.S.C. §

3730(h); and in addition

(c) Award Plaintiff costs, including but not limited to reasonable attorney's fees and any

expert witness fees, and in addition

(d) Award Plaintiff such other and further relief as may be appropriate.


## JURY DEMAND

PLAINTIFF KATHLEEN A. HARASEK DEMANDS A TRIAL BY JURY.


September 29, 2017                                   Respectfully submitted,

Brandon J. Newlands
Bnewlands@cbcblaw.com
D.C. Bar No. 474835
CHARLSON BREDEHOFT COHEN
  & BROWN, P.C.
11260 Roger Bacon Drive, Suite 201
Reston, Virginia 20190
(703) 318-6800  Telephone
(703) 318-6808  Facsimile

*Counsel for Plaintiff, Kathleen A. Harasek*