UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KATHLEEN A. HARASEK,<br><br>*Plaintiff*,<br><br>v.<br><br>NATIONAL RAILROAD PASSENGER<br>CORPORATION d/b/a/ AMTRAK,<br><br>*Defendant*. | Civil Action No. 17-2017 (RDM) |

**MEMORANDUM OPINION**

This case presents a single issue: Whether Defendant National Railroad Passenger Corporation ("Amtrak") is subject to the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.* Plaintiff Kathleen Harasek, a former Amtrak employee, alleges that her supervisor retaliated against her, in violation of 31 U.S.C. § 3730(h), for filing a report with Amtrak's Office of the Inspector General ("OIG"). The matter is before the Court on Amtrak's motion to dismiss, Dkt. 5. The Court agrees that Plaintiff fails to state a claim for relief because the Amtrak Reform and Accountability Act ("the Reform Act"), Pub. L. No. 105-134, § 415(d), 111 Stat. 2570 (1997) (codified at 49 U.S.C. § 24301(a)(3) (2001)), provides that Amtrak "shall not be subject to title 31," *id*. The Court will, accordingly, **GRANT** Amtrak's motion to dismiss, Dkt. 5.

**I. BACKGROUND**

For purposes of the pending motion, the Court accepts as true the facts alleged in the complaint, Dkt. 1. *See Wood v. Moss*, 134 S. Ct. 2056, 2065–67 & n.5 (2014); *see also Williams v. Ellerbe*, 317 F. Supp. 3d 144, 146 (D.D.C. 2018).

Plaintiff Kathleen Harasek worked as an Inspector for the Amtrak Police Department ("APD") from July 2013 to July 2016. Dkt. 1 at 3, 15 (Compl. ¶¶ 15, 66). In September 2015, Plaintiff was selected by Amtrak's Chief of Police, Polly Hanson ("Chief Hanson"), to spearhead efforts to plan Pope Francis's visit to the United States. *Id.* at 4 (Compl. ¶ 19). This assignment was "a massive undertaking" involving coordination between multiple security and law enforcement agencies. *Id.* Plaintiff avers that due to her work on the Papal visit, her "administrative and operational responsibilities" were reassigned to another officer at the "direction of Chief Hanson and APD leadership." *Id.* at 4–5 (Compl. ¶ 21).

Plaintiff's role as an Inspector also entailed leading instructional programs for "external law enforcement partners." *Id.* at 5 (Compl. ¶ 27). This included RailSafe, a two-day outreach program about "the capabilities of the APD" and how external law enforcement could "assist with responding to incidents within [the] APD's jurisdiction." *Id.* at 6 (Compl. ¶ 28). From 2014 onward, the RailSafe program was funded by grant money from the United States Security and Transportation Authority. *Id.* (Compl. ¶ 30). Amtrak solicited bids from third-party vendors to implement the program, and ultimately awarded the contract—valued at over $1,000,000—to a security consulting firm, ABS Consulting ("ABS"). *Id.* (Compl. ¶¶ 31–32).

During the summer of 2015, Plaintiff "became aware that ABS was involved in fraudulent, or potentially fraudulent activity[,] arising from its work associated with the RailSafe Program." *Id.* at 6 (Compl. ¶ 33). Specifically, Plaintiff alleges that "ABS was fraudulently submitting claims . . . for the work that was actually performed by Amtrak personnel, all under the direction and supervision of Chief Hanson." *Id.* at 8 (Compl. ¶ 38). ABS allegedly used "handouts and materials" prepared by Amtrak staff "without permission or consent," *id.* at 7 (Compl. ¶ 35), and took credit for presentations and logistical services that "were led and

conducted by Amtrak personnel, not ABS," *id.* (Compl. ¶ 36). Plaintiff further suspected that "Chief Hanson was directly or indirectly involved, and/or economically benefitting from" ABS's activity because of her "close personal relationship" with Kerry Thomas, the RailSafe project manager at ABS. *Id.* at 6–7 (Compl. ¶ 33). In mid-October 2015, Plaintiff reported these concerns to Amtrak's Office of the Inspector General ("OIG") and "request[ed] that the OIG investigate . . . Chief Hanson's potential involvement." *Id.* at 8 (Compl. ¶ 39).

Plaintiff alleges that, shortly thereafter, Chief Hanson subjected her to a series of adverse employment actions in retaliation for her report. *See id.* at 8–15 (Compl. ¶¶ 41–67).

*First*, Plaintiff alleges that on or about October 21, 2015, Chief Hanson transferred her to an "undesirable position of lesser status"—"Inspector/Inspection and Audits." *Id.* at 8–10 (Compl. ¶¶ 41, 45). She further alleges that due to the transfer, she was "stripped of supervisory duties and administrative staff," "assigned to menial tasks," and "limited" in her "exposure to other ranking APD personnel." *Id.* 9–10 (Compl. (¶ 45)

*Second,* Plaintiff claims that on November 17, 2015, Chief Hanson assigned her "holiday travel duty" over Thanksgiving even though "the typical protocol was to assign a Sergeant or Captain" for the job. *Id.* at 10 (Compl. ¶¶ 48–49). In that same conversation, Chief Hanson allegedly "accused [Plaintiff] of causing problems within Amtrak, and further threatened that [Plaintiff] should resign from the APD or there would be negative consequences." *Id.*

*Third*, Plaintiff avers that on or before December 4, 2015, Chief Hanson gave her a negative performance review, stating that Plaintiff "[d]id [n]ot [m]eet [c]ommitments" for "4 of the 9 Smart Goals set forth on [her] Performance Evaluation." *Id.* at 11 (Compl. ¶ 53). The review, however, did not account for Plaintiff's special assignment to the Papal visit or the reassignment of her operational duties during that time. *Id.* at 12 (Compl. ¶ 57). Plaintiff alleges

3

that "Chief Hanson's negative ratings . . . precluded [her] from receiving any promotion, salary increase[,] or monetary award at the end of the fiscal year," and "derailed" her career advancement at Amtrak. *Id.* at 11–12 (Compl. ¶ 54).

*Finally*, Plaintiff alleges that on or about March 9, 2016, she was informed that Chief Hanson had filed an "Internal Affairs Complaint" against her, accusing her of making false statements "in the self-evaluation section of her 2015 Performance Review." *Id.* at 13 (Compl. ¶¶ 61–62). This complaint was later dismissed. *Id.* at 15 (Compl. ¶ 68). Plaintiff nevertheless asserts that "the mere filing of [the complaint] [had] negative consequences" and "impede[d] her future employment opportunities and advancement at Amtrak." *Id.* at 14 (Compl. ¶ 63).

As a result of these "harassing, retaliatory, and deliberate actions," Plaintiff alleges that she "was constructively discharged by Amtrak on July 1, 2016." *Id.* at 15 (Compl. ¶ 66). She subsequently filed this suit, alleging a claim for retaliation in violation of the FCA, 31 U.SC. § 3730(h), and seeking damages, attorney's fees, and other "relief as provided by the False Claims Act." *See* Dkt. 1 at 16, 18 (Compl. ¶ 71, Prayer). Amtrak has now moved to dismiss on the ground that, "by statute, Amtrak is not subject to suit under the FCA." Dkt. 5-1 at 3 (citing 49 U.S.C. § 24301(a)(3)).

## II. LEGAL STANDARD

A motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6) is designed to "test[ ] the legal sufficiency of a complaint." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). In evaluating such a motion, the Court "must first 'tak[e] note of the elements a plaintiff must plead to state [the] claim' to relief, and then determine whether the plaintiff has pleaded those elements with adequate factual support to 'state a claim to relief that is plausible on its face.'" *Blue v. District of Columbia*, 811 F.3d 14, 20 (D.C. Cir. 2015) (alterations in

4

original) (internal citation omitted) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675, 678 (2009)). Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), "a complaint must contain sufficient factual matter, [if] accepted as true, to 'state a claim to relief that is plausible on its face,'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

### III. ANALYSIS

For the reasons set forth below, the Court concludes that Plaintiff cannot state a claim for relief under the FCA against Amtrak.

**A.** **Text**

The parties agree that the plain language of the Reform Act expressly provides that Amtrak "shall not be subject to title 31." 49 U.S.C. § 24301(a)(3). They disagree, however, whether this exemption includes the FCA, which is codified in title 31. According to Plaintiff, § 24301(a)(3) is ambiguous because it "collides with the literal command" of the FCA, Dkt. 9 at 7 (quoting *Montana v. Clark*, 749 F.2d 740, 745 (D.C. Cir. 1984)), which Plaintiff reads as permitting all claims "against 'any person,' including corporations, for fraud committed against the United States," *id.* at 11. Plaintiff also argues that giving effect to the plain meaning of § 24301(a)(3) "would yield an 'odd result'" because it would "require this Court to believe that Congress . . . agree[d] to provide money from its Federal coffers [to Amtrak] without any recourse . . . should a fraud be perpetrated." Dkt. 9 at 11, 13 (quoting *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1088 (D.C. Cir. 1996)). The Court is unpersuaded by either argument.

First, and foremost, Plaintiff's attempt to read ambiguity into § 24301(a)(3) is foreclosed by D.C. Circuit precedent. As Amtrak correctly points out, in *U.S. ex rel. Totten v. Bombardier Corp.* 286 F.3d 542, 548 (D.C. Cir. 2002) ("*Totten I*"), the Court of Appeals read § 24301(a)(3)

5

to "prevent[] Amtrak from . . . being sued under the False Claims Act." *Id.* at 548. As the court explained, in providing that Amtrak "shall not be subject to title 31," 49 U.S.C. § 24301(a)(3), Congress relieved Amtrak of its obligation to "conform its actions to the terms imposed by" the FCA and other statutes found in title 31. *Totten I*, 286 F.3d at 548. To be sure, Amtrak's own conduct was not at issue in *Totten I*, and all that the court *held* was that the FCA *does* apply to third parties who contract with Amtrak. *Id.* But the inescapable import of the court's reasoning is that § 24301(a)(3) precludes Amtrak itself from being "subject to" the FCA. *See id.* ("Here, [plaintiff] seeks to use the FCA not to regulate Amtrak, but instead to recover for the purported fraud of contractors hired to serve the railroad."); *see also id.* at 549 ("[Plaintiff's] litigation will not compel [Amtrak] to take any action in order to satisfy the demands of the FCA. His action therefore does not implicate the Reform Act's 'subject to' provision."). As such, contrary to Plaintiff's assertion, Dkt. 9 at 14, the D.C. Circuit has recognized that Amtrak is not "subject to" the FCA.

Plaintiff's "statutory conflict" and "odd result" arguments are also unpersuasive. With respect to the first, the Court agrees with Amtrak that the Reform Act and the FCA "can easily be read together with no conflict." Dkt. 11 at 3. While the FCA generally imposes "[l]iability for certain acts" committed by "any person" defrauding the federal government, 31 U.S.C. § 3729, the Reform Act carves out a specific exception for Amtrak. The Supreme Court has long held that courts can, and should, give effect to "[s]pecific terms"—here, the exclusion in the Reform Act—"over the general [terms] in the same or another statute"—here, § 3729 of the FCA. *D. Ginsberg & Sons v. Popkin*, 285 U.S. 204, 208 (1932); *see also Kepner v. United States*, 195 U.S. 100, 125 (1904) ("It is a well-settled principle of construction that specific terms

covering the given subject-matter will prevail over general language of the same *or another statute* which might otherwise prove controlling." (emphasis added)).

Nor does reading the Reform Act to exempt Amtrak from FCA compliance produce the "odd result" of leaving the federal government with "no recourse" against the fraud allegedly perpetrated here. There are multiple safeguards. To begin, as Amtrak acknowledges, it is subject to the Inspector General Act of 1978. Dkt. 11 at 8 (citing 5 U.S.C. App. § 8G(a)(2)); *see also Dep't of Transp. v. Ass'n of Am. R.R.*, 135 S. Ct. 1225, 1232 (2015) (noting that Amtrak is a "designated Federal entity" under the Inspector General Act of 1978). That Act charges Amtrak with maintaining an OIG to "prevent[] and detect[] fraud and abuse in . . . [Amtrak's] programs and operations." *See* 5 U.S.C. App. § 4(a)(3). Furthermore, Plaintiff—or any other individual— could have sought redress for the alleged fraud perpetrated by ABS under the FCA. As the D.C. Circuit made clear in *Totten I*, the Reform Act does not preclude a *qui tam* action against ABS, a third-party contractor. *See* 286 F.3d at 548. Finally, the Federal Railroad Safety Act ("FRSA"), 49 U.S.C. § 20109, specifically addresses the type of retaliation alleged here. The FRSA states:

> A railroad carrier . . . may not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee if such discrimination is due, in whole or in part, to the employee's lawful, good faith act done . . . to provide information . . . [to] a Federal, State, or local regulatory or law enforcement agency (including an office of the Inspector General under the Inspector General Act of 1978 . . . .)

49 U.S.C. § 20109(a)(1)(A). And the statute also provides a remedy:

> An employee who alleges discharge, discipline, or other discrimination in violation of subsection (a), (b), or (c) of this section [delineating protected forms of whistleblowing], may seek relief in accordance with the provisions of this section, with any petition or other request for relief under this section to be initiated by filing a complaint with the Secretary of Labor.

7

*Id.* § 20109(d)(1). Thus, Plaintiff could have filed "a complaint with the Secretary of Labor" seeking redress, *id.*, but she did not. She chose instead to file suit under the FCA. The Court cannot give credence to an "odd result" of Plaintiff's own making.

**B.     Legislative History**

The Court is also unconvinced by Plaintiff's resort to the legislative history of the Reform Act. As a threshold matter, the Court "ha[s] no authority to enforce [a] principl[e] gleaned solely from legislative history that has no statutory reference point." *Nat'l Ass'n of Broads. v. FCC*, 569 F.3d 416, 422 (D.C. Cir. 2009) (alteration in original) (citation omitted); *see also Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) ("[C]ourts must presume that [the] legislature says in a statute what it means and means in a statute what it says there."); *U.S. ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 497 (D.C. Cir. 2004) ("*Totten II*"). Here, Plaintiff offers no plausible reading of § 24301(a)(3) that would relieve Amtrak of some title 31 obligations but not others. But, even beyond that, Plaintiff's argument is unconvincing.

Plaintiff contends—without specific citation—that the Reform Act's legislative history demonstrates that it "was not intended to preclude a private individual's claim for retaliation under the FCA, but merely to free Amtrak from the restrictions of a mixed-corporation company." Dkt. 9 at 12. To be sure, the legislative history of the Reform Act does reflect that Congress intended to "eliminat[e] [f]ederal micromanagement of Amtrak's operations," H.R. Rep. No. 105-251, at 13 (1997), and to allow the carrier to "operate as much like a private business as possible," S. Rep. No. 105-85, at 1 (1997). *See also Totten I*, 286 F.3d at 549–50. But the legislative history of the particular provision at issue here, § 24301(a)(3), is far from illuminating. The House Report merely reflects that Congress intended to "remove[] Amtrak from the Government Corporations Act." H.R. Rep. No. 105-251, at 34; *see also Totten I*, 286

8

F.3d at 549. Section 24301(a)(3), however, "plainly does more than" that, "and must be construed accordingly." *Totten I*, 286 F. 3d at 549.

Finally, Amtrak argues that had Congress intended to subject it to the FCA, Congress could have amended the FCA after the D.C. Circuit's decision in *Totten I*.[1] *See* Dkt. 11 at 12–14. It did not do so, for example, when it amended the FCA in 2009 to "correct erroneous interpretations of the law that were decided in . . . [*Totten II*]." S. Rep. No. 111-10, at 10 (2009). This subsequent legislative action, however, does not rise to the level of a ratification of the interpretation of § 24301(a)(3) set forth in *Totten I*. *See U.S. Ass'n of Reptile Keepers, Inc. v. Jewell*, 103 F. Supp. 3d. 133, 153 (D.D.C. 2015) ("[T]he ratification canon is of 'little assistance' where Congress has not re-enacted the entire statute at issue or significantly amended the relevant provision." (citation omitted)). Nevertheless, given the plain language of the Reform Act and the absence of any compelling reason to discount that text or the D.C. Circuit's decision in *Totten I*, this is not a case that requires any such ratification.

---

[1] Amtrak also notes that Congress has twice amended § 24301 of the Reform Act since the D.C. Circuit's decision in *Totten I* without altering or clarifying the language relating to the title 31 exclusion. *See* Dkt. 11 at 4 n.1 (citing Pub. L. 110-53, § 1502, 121 Stat. 452 (2007); Pub. L. 108-199, § 150(2), 118 Stat. 303 (2004)).

## CONCLUSION

For the foregoing reasons, the Court will **GRANT** Defendant's motion to dismiss, Dkt. 5.

A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: September 22, 2017